We'll move to the next case on the calendar, which is 24-2058, Chen v. Noem. And we'll let counsel come up and get settled here. Mr. Perkins, is it? That's right, Your Honor. And I understand you would like to reserve two minutes for rebuttal, is that right? That's correct, Your Honor. Okay. Whenever you're ready. Thank you, Your Honor. Good morning and may it please the Court. This case is about a troubling trend in the district courts that is ripe for this Court to address. The problem is this. District courts are contravening Congress's intent and giving the federal government a free pass to take years to process applications. I think we understand the facts, and given that we have limited time, I think you can dig right into the substance of the argument, which is, why don't you start with why it's not moot? I understand that's your argument. So why don't you just dive right in? Absolutely. Thank you, Your Honor. So we believe there are six reasons the case is not moot. Given our limited time today, I'll focus on the primary one. Give us the best ones first. Absolutely. We believe that Mr. Chen can still obtain nunk-pro-tunk relief, such that the district court can enter into an order to issue a declaratory relief. But I guess that's different. Mootness suggests he's already gotten the relief. So you're saying we could go back or the district court could go back and give relief, but that has no bearing on mootness. The question is, has he already, or Chen, already received the relief? He has received an adjudication of his I-601A application. So there's no more delay, right? There's no more delay with respect to the application. And there's no more, I don't have an adjudicated application, right? That's correct, but we believe there are collateral consequences of the delay that persist and continue to occur. What are the collateral consequences? Yeah, tell us those. Other than the loss of attorney's fees, which I might be sympathetic towards you, but the Supreme Court has said quite clearly that that is not enough to make an argument not moot, that you could get attorney's fees if you got an order. So I might have been very sympathetic, but they've said no. So what are the collateral consequences of it? The primary consequences that we're focused on, Your Honor, are with regard to the impact on Mr. Chen's ability to obtain citizenship in a timely fashion and also for his family. So two things there. Break that down. You say his ability to get citizenship in a timely fashion. Are those two separate things? Like, A, you're not sure he can get citizenship, and B, even if he does, it's not going to be timely? He has a five-year. Or is it only one thing? So there's a five-year statutory period during which he must wait to— And that runs from what point? From when he returns to the U.S. following the grant of his visa in China. But that hasn't started yet. I guess you can update us. Has he gone back? He has not returned to the United States yet. He has not returned to the United States? He remains in China at this time, and he's had a visa interview where he was informed that it was— and again, this is new facts that post-date— Yeah, yeah, but we can accept your representation. So he had a visa interview. And he was informed the visa had been issued. Has, yes, been issued? It has. However, he was very recently informed that he should come in for another interview, and he was listed on the form that summoned him as well as his wife, who is also— I'm sorry. Could you just speak up? I didn't hear what you just said. I apologize, Your Honor. Let me bring these in a bit. He was informed on the form that summoned him for the visa interview that he is available, that he needs to appear as well, indicating that something with his visa may remain contingent. For his wife's visa? It's not clear to us, Your Honor. What form are you saying? The manner in which he was summoned to appear or reappear. But how does a different judgment in this case affect any of that? I mean, I understand that there are all sorts of problems, and also the fact that maybe if he had gotten this earlier, he might, although we have no way of knowing, have different visa things. But how does that affect what we would decide in this case? I would say— In that case, you have asked us to say that they should act. That they should— They acted, and I'm willing to accept that they acted because you were bringing an appeal, at least an arguendo, that they were doing it to move the case. But I still want to know what difference it makes. It makes a difference because the district court can enter a declaratory judgment saying that this relief was unreasonable and as a result issue equitable relief, non-proton relief, that deems his application to have been approved earlier, and that allows him to apply for his children to obtain legal permanent residence status significantly earlier, all of which has benefits that accrue for them as well. How does that work? Map that out, because I don't remember seeing that in your brief. Did you say that in your brief? We articulated it in our reply brief. About the children? Yes. I had the brief. Because map that out for me. I'm not understanding. Because you were just, I thought, mapping out that he's got five years after he returns from China, and that's to get what? That's for him to obtain citizenship. So it seems to me that the last thing you would want is for us to sort of backdate that stuff and sort of not start the running of the five-year period until some earlier date, right? You want it to continue to run only from the date he gets back from China, right? You don't want to give him less time to get citizenship, do you? We believe the entire sequence of events. Just answer my question. I get it. You may have things you want to add, but I'm just trying to break it out into small digestible chunks that I can understand. You don't want to shrink the five-year window that he would have prospectively to get citizenship, correct? That's correct, Your Honor. Okay. So then I don't understand. So his getting his citizenship, how is that made easier by getting some sort of non-proton relief? Just pause on that point. I wasn't intending to suggest it would be easier. Or better, or in any way for him. I was suggesting it would be sooner. How could he get citizenship sooner, and maybe I'm just not understanding, how could he get citizenship sooner if somehow the court, I don't know, backdates the date of the adjudication? It would make the effective date of when he's eligible for the five-year period starts to run earlier. But if it does, how does that benefit him? And if it doesn't benefit him, how does it not make it move? I mean, this is always the question. I mean, there may be changes that could be done, but in order for something not to be moved, it has to be something that benefits him. Absolutely, Your Honor. And if I could just very briefly describe the process by which this operates. Mr. Chen's sister is a citizen. She filed an I-130 form that enables her to register that he is her brother. Then there was other processes he went through, including the I-601A process, which is the initial delay here, that enables him to then go to China, seek the visa that connects to his sister's form that she filed for him, and then he can return without waiting a 10-year period. And upon his return, the five-year citizenship window starts, and then he can also at that point file I-130 forms himself now that he's a legal resident for his children. And just so I'm understanding, it's a five-year window. It's not a five-year waiting period. It is a waiting period. Oh, it is a waiting period. If I miss that window, I apologize, Your Honor. Okay, so that helps a little bit. So you're saying he's got to sit around and wait five years, and if he only has to sit around and wait four years or three years, that's better for him? Absolutely. Okay. He can then vote at that point. All right, that's a little bit more helpful. Okay. Yes, and there's more I can say. I realize my time has expired. I'm happy to elaborate on the process.  Keep going. Thank you, Your Honor. I don't know if we're going to get all six of your points, but give us a couple more. Sure. Well, if I could just finish elaborating a bit on the nut-crow-tunk relief point. There's a long tradition of nut-crow-tunk relief in immigration cases. This Court said so in the Edwards case, in the Urey case. There's more other case law as well. And the operation of that relief is a far-reaching equitable remedy is what the Court has said, and it enables courts to backdate equitably the dates that immigration benefits. But basically what you're saying, let me see if I understand it, is that the time that he had to wait was too long, even though the average is 40 months and his is 44, 44 and his is 40. So you'd like to get a decision by the district court that the average time that people have waited has been too long, and therefore his should have been shorter, and therefore he could start getting his citizenship earlier. And apply for his children to seek legal residence status as well. So I get nut-crow-tunk, which is now for them. So if today, hypothetically, we issued an order, we're saying the order is effective today. I mean, normally nut-crow-tunk is a deadline has expired, right? You asked for an extension of time. Your brief was due last week. I don't rule on it until today. I grant you nut-crow-tunk relief. And I say, yeah, yeah, I know the deadline expired, but don't worry about it. This order will be treated as though it was entered the day it would have, the deadline would have expired, and now we're still giving you a week. But you're saying now, now for then, you're almost saying then for then. Are you saying that the court should have entered, let's say the court entered an order today. When would it be hypothetically backdated to? I don't understand that. Because usually it's effective the day that it's entered. Let's say, Judge, the district judge had entered this order, which by definition would have been before the adjudication, right? Because the adjudication happened after the notice of appeal. I mean, the order would have only come into effect and acted as an adjudication as of the day the court entered the order, right? That's true. I mean, she wouldn't have backdated it and said, no, I'm going to hypothesize that it was, in fact, adjudicated one day after he filed it. I mean, we wouldn't do that, would we? No, the court wouldn't do that. So what are you proposing that we or we would remand for the court to do? Concretely, concretely, you say nunk pro-tunk, but fill in the nunk and fill in the tunk. I'm serious. No, absolutely. Certainly, as Your Honor said, nunk pro-tunk relief usually is something that operates as a briefing deadline. But in the context of these immigration benefit questions, there is case law from the circuit saying that courts can equitably adjust the date back to a certain time of when an immigration benefit. Yeah, so when would you adjust it to? That question speaks to what would be reasonable. Yeah, yeah, yeah, speak to me. Give me the date. Give us the date. I mean, presumably, if you were before the district court, you would be asking for fixed. Say, here's the draft order. You know, this is my relief that I'm seeking. Tell me what is the relief you would have wanted from the district court. Without having seen an administrative record in this case or have any insight at all into what the government's process was, it's difficult for us to determine. You're asking us for relief from mootness. I mean, what would the, as Judge John Deaton asked you, what would the decreed language in a writing we put out say? This court would reverse and remand and say that dismissal was improper for a number of reasons that we haven't spoken about on the merits perspective track and say we remand to the district court to determine what amount of time. Well, that's a tough writing even for us in a case where you got below the relief you wanted. The relief was issued while we were in this court, we would note. But I think there is definitely a way that it could be structured. You would like us to send it back and say, essentially, that you would like to argue to the district court that this should have been done, not 40 months, but say 30 months, and at that point you would come up with a specific date in the face of Triasca or Reddy or all of that stuff, which let's say we don't get into, and say the date they should have done it was at 30 rather than when they did it. And there is reason why that benefits my client. And therefore, it's not moot to send back whether that could be done. Is that what you're saying? I believe so, Your Honor. In the first instance, we would ask for the motion to dismiss. The case is up here on a granting motion to dismiss. So we'd be back in the district court. We'd have an administrative record produced that would show what consideration the agency had given to the application at the time that it was received, why the delay took so long, and from that we would have facts on which to determine what was reasonable. So you're proposing to go back to the district court and somehow prove that you were, as a matter of law, entitled to the relief you got at an earlier date? I think it would be a mixed question of law and facts, Your Honor. All right. And there's some key data points about what should be reasonable in this context that I think are mentioned in the brief. Whether it's law or fact, something that the district court could do is what you're saying at an earlier date, is what Judge Parker is asking. Right. The district court can make a determination, declaratory judgment, that this amount of time was unreasonable and say, because of that, in light of the party's briefing and what I've seen in the administrative record, I'm going to deem equitably. How could it do that without parsing the hundreds of cases that were in the pipeline that got decided in the interval you were waiting? I mean, I can't – I have a difficult time imagining what a district court would have been obligated – would be obligated to do under your proposal. I don't know that district court would be obligated exactly. I think it would be a matter of equity. Let me ask you. Discretionary? Yes. I mean, when these track unreasonably delayed cases do finally reach a judgment, if they reach a judgment that the agency has unreasonably delayed – So the district court would have to go through countless numbers of these cases. Well, this one got adjudicated pretty much on time. This one was a little late. This one was early. And why? I think those would be outside the scope of what the district court would look at. I mean, the question for unreasonable delay is – What would the district court look at? It would – I believe – we're a little bit at a loss to say because we don't have any evidence from the government of any kind. Then how can you make the argument? Well, upon return to the district court, we would ask the government to produce the administrative record, which is the standard procedure for administrative procedure at cases. They could produce any materials that the agency considered. They could put in evidence to say we had this many applications ahead of this one, and this is the time – Let me ask you whether this is really in your client's advantage because you know they are free to take this back and then to deny it. And if they deny it, that is action, and we don't have jurisdiction. No court has jurisdiction. There's a question of whether we have jurisdiction here, and let's say we side with the circuit, the Fourth Circuit rather than the Seventh, and say that we have jurisdiction because this is inaction. But we all agree, and it's true, that if they act, they – that is the end of it. So, if we do all that you want, what is to stop the government from saying no prospoke monk? We take it up, deny it, and that's the end of it. And then your guy is out and agrees. So, you know, you're supposed to be arguing for your client, not for whether 40 is too much or too little in general. And I'm just asking you in terms of your client. You got something, and you may lose it all. So, are you really asking us to go into this complicated way of saying it's not moot when it might not help you? I think we would expect the government would not punish Mr. Chen for seeking – I think that if you expect that the government will not punish, you are expecting something that I don't think any reasonable counsel today can do, frankly. And I'm not speaking whether this is bad or good because that's not my job, but I'm just saying that as counsel, I would be mighty scared of doing anything which might just tempt the government to punish. Why don't we do this? You've reserved a couple minutes for rebuttal, and we've kept you considerably past your time. Why don't we hear from the government, and then we'll see you again before long. Okay. Thank you, Your Honor. So why don't we hear – is it Mr. Schackner? Thank you, Your Honor. Good morning. Elliot Schackner, Assistant United States Attorney, Eastern District of New York. Do speak right into the microphone. Sure. Both of them. Yeah, just keep your voice up. Okay. Is that better, Your Honor? Yes, sir. Okay. I'll try to speak up. Your Honor, I think it's important to direct the court to what the plaintiff – what Chen requested before the district court. It's not very much. It's not very hard to read. It's on page 10 of the joint appendix. He said, declare that defendants failed to perform a duty to the plaintiff by processing his application for almost two years. Declare that that action was agency action or that conduct was agency action, unlawful, withheld under the APA. Compelled the defendants to act on his application by approving it and then attorney's fees and what have you. So you're saying what they were – what he was complaining about was give me this thing. Give me this relief. Exactly. It's been too long and you haven't given it to me and both of those things have gone poofy. Exactly. All he wanted at most was adjudication and approval of the I-601A. That's happened. Which he obviously got. Exactly. There was no mention in the district court of non-protocol. In fact – Well, that makes sense because, of course, it hadn't been adjudicated yet, but I take it looking at, for example, paragraph 17 of the complaint. He says the delay or denial in the processing will cause extreme hardship to his parents who are lawful permanent residents and they suffer from anxiety due to his unsettled immigration status. So you're saying that – I mean, I don't know, maybe that continues because in their argument this is still taking too long. Well, this meaning the adjudication of the I-601A and that's already happened. Yeah, but let me put their argument not in the non-protocol but in this in the strongest. They say you can reverse this and they have to bring a new suit. And you say, well, that's a new suit. But a new suit can also be a ground for delay. That is, you could reverse and deny and that doesn't delay further, but reversing and bringing a new suit may be another way in which the government can delay. And that, if you have mooted it intentionally, is your burden because you say it's their burden to show that. But when there is intentional mooting, it is then the government's burden to show that they haven't done it. And so you would have to show that a new suit was not brought, the thing wasn't done in order to delay further. So that's an argument that can be made. Again, I have trouble seeing why they would make it in terms of their client. But that's the argument that I think you have to make, me, and that you haven't met in your briefs because you always say it's their burden because normally it is their burden. Well, regardless of whose burden it is, Your Honor, there is absolutely – all we have is Chen's conclusory allegation. All we have is intent. All we have is the timing. Was the timing just simply coincidental? Yes, Your Honor. Absolutely. And I guess – actually, if I can interrupt. So I guess the two things we have, right? One is we know the date on which the adjudication happened, which is what, 40 months? Yes. And then the other thing we have, which we can take judicial notice of, is what the district judge noted, is that according to the website for USCIS, as of June 5, 2024, 80% of these applications were taking 43 months. Now, I just looked at the website because, again, we can take judicial notice of this, and it's currently, I understand, as of a couple days ago, 36 months. So it seems to be on a downward trend from 43 to 36. I don't know where 40 months plots out, but it seems consistent with that. So we have those data points, and that's it. I guess the question on their side is, are they entitled, based on those facts, to say there's enough of a question about whether maybe, given the timing, they're entitled to, I don't know what, maybe engage in discovery to then establish that the government did this intentionally to move things out because it's your burden and these data points aren't enough? I guess that would have to be their argument, right? I suppose that is their argument, Your Honor. But the facts belie any such argument because, well, first of all, the plaintiff, the chin, does not explain why the government would move this suit. Right. So that's your other argument. It's illogical. You guys won below. Right. So why would you be trying to move this out? Exactly. I guess the other data point you point out in your brief is there are other cases in the last two years, 2024 and 2025, in other courts and other circuits, following essentially the same claims, the same track. The government has not been moving them out. They've gone to decision in the circuit. So we would have to somehow infer that this one case was strategic behavior and that the government has purposely been avoiding strategic behavior in these other cases. And not just the court of appeals cases but the district court cases as well. If you look at Lovo, I think, if I'm not mistaken, Lovo identified roughly three dozen district court cases that were decided. So there's no evidence of the government running around moving these cases out as someone sues. And, of course, if you haven't, then the burden is theirs. Yes. Just if you have. That's correct. So the fact that there's no plausible allegation of any pattern or practice, so to speak, of moving and the fact that the adjudication time here was within normal processing times. And, yes, Your Honor, the processing times have gone down in part because of something we mentioned in the district court. And in our brief here, USCIS established the Hart Center, H-A-R-T Center, to adjudicate these applications and this type of applications and three others. And it's had an effect, as Your Honor said. It's 36 months now as of this morning, last I checked. Can you just confirm if you're in a position to do so? Your opposing counsel made several representations about the current state of play. I don't know if you're aware of these, whether you're able to confirm what he said or add to anything that he said in terms of the fact that Mr. Chen has gone to China, has not yet returned, has had his, can you confirm, has he had the visa granted? Yes, the visa was granted back in March. March of 25? March of this year, yes. Roughly seven weeks ago. As to counsel's statement about a requirement that he appear for another interview or his wife appear for an interview, this is the first I've heard of it. Now, in all candor to the court, the State Department is not a defendant in this case. But nevertheless, you know, we have been in contact, you know, and we were able to determine that the visa application was approved. But this is the, but in terms of requesting, and we also can confirm, again, at least as of yesterday, that Chen had not returned to the United States, but this allegation. And his five-year waiting period would begin when he returns to the United States? I understand that's what opposing counsel was saying. Is that your understanding or no? That I'm not sure, Your Honor. Again, this is something that's being, you know, this is one of a number of matters which is being raised for the first time today or maybe in the reply brief. So I don't want to address that on the fly, so to speak. Thank you. Thank you. Thank you very much. Why don't we hear from Mr. Burns. You've reserved two minutes for rebuttal, and we'll try to keep it tight. Now, but I have a question. Nunc pro tonc is always an equitable remedy, right? Yes, Your Honor. So in deciding whether an equitable remedy should be granted, the court can look to the general interest of a client and decide that, you know, this might make nice law, but equitably it ain't a good idea. And why shouldn't we be concerned about that in deciding whether even to open up that issue? I believe Mr. Chen's feeling is that he would like to seek the benefits of having earlier and earlier the beginning of the five-year citizenship period starting earlier for the ability to petition for his children to come to this country earlier. I believe that is his view. I understand that you may say that, but we decide equity. You know, the thing about equity is that the court looks and says, come on now, what makes sense? And we would ask to brief that issue in the district court where we can look at the administrative record, look at what's been before the agency and how they've considered it. To this point, we have no visibility at all into the agency other than ten words on their website. What is your theory about why your client was entitled to this relief at some different or some earlier time? Where does that entitlement arise from? There are a few different points on this, Your Honor. First, in 2000, Congress said in an amendment to the Immigration and Nationality Act that it's the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing. The sense of the Congress? We don't contend that it's binding. It's not even remotely binding, right? No, it's not. Have we ever enforced something based on the sense of a Congress part? No, we're not. And we're not asking you to, Your Honor. Okay. It's just simply a strong indication from Congress of what they expect is reasonable. That's aspirational. And it sounds like that's what the government is aspiring towards. They've moved from 43 to 36 months in the span of a year. The D.C. Circuit has said that – I mean, let me just pause on that. You don't dispute that we can take judicial notice of an official government website, right? No, of course. Okay. The D.C. Circuit has said recently that courts can look to Congress's aspirational statement as a ruler against which the agency's processes must be measured. I still – but you haven't answered my question. I still don't understand your theory about why you have an entitlement or right or something to have this thing adjudicated at a different date than the government actually did. We understand from the government and Federal Register publications that each of these applications should take an average of 2.7 hours to complete. It's an average. So some take longer. Some take less. Why is your client entitled to have the adjudication dated some date other than when it happened? We believe it's a question of reasonableness tied to the – That doesn't – that's a question of reasonableness. That's not at all helpful to me. There – as Judge Calabrese was indicating, there are equitable considerations that courts can take into account of really any kind that bear on whether it would be reasonable to issue equitable relief. And we believe a situation where Mr. Chen has been in a state of grave uncertainty for a long time with his parents, with diagnosis – So have hundreds and hundreds of other people. Some get relief before. Some get relief after. Why is your client special? Actually, if I could piggyback on that. You just mentioned there's some statistic that you saw somewhere that it should take, in theory, 2.7 hours to adjudicate one of these. Have you multiplied out 2.7 hours times all of the applications that were presumably ahead of your clients in line? And then are you then making an argument that that only adds up to, you know, 10 months or something? Have you done that? I don't know that we've done the arithmetic exercise. I will say that previously in the last – from fiscal years 2013 to 2018, the median processing time for one of these applications was under five months. And then it shot up over 600 percent by 2022. And that's covered in some of the amicus briefs that actually go into that in more detail. Yeah, yeah, yeah. But that's what I'm saying. So the time that your client was getting his thing adjudicated – You're not suggesting, I take it, that, you know, they were adjudicating some and then just going out for a smoke for the rest of the day? We simply don't know, Your Honor, because this has been decided on a motion to dismiss with no initial – All right. Well, I think we have your argument. And let me just say this. We appreciate the argument of both counsel today. We very much appreciate the briefing. We will reserve decision. Thank you. Very good argument from both sides. Thank you very much.